**UNITED STATES DISTRICT COURT**
**DISTRICT OF MAINE**

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>)<br>v. )<br>) Docket no. 2:15-cr-00079-GZS<br>SHAUN WRAY et al., )<br>)<br>)<br>Defendants. )<br>) | |

**ORDER ON MOTION TO SUPPRESS**

Before the Court is the Motion to Suppress Evidence of Defendant Guy Noel ("Noel") (ECF No. 320) (the "Motion to Suppress"). The Motion to Suppress has been joined by Defendant Iris O'Toole ("O'Toole"). (ECF No. 338.) The Court held an evidentiary hearing on the Motion to Suppress on June 14, 2016.

For the reasons explained below, the Court DENIES the Motion to Suppress.

**I.     FACTUAL FINDINGS**

The following facts are drawn from the record in this case, including the search warrant dated March 24, 2015 (ECF No. 320-1), the affidavit of Agent Madore in support of the application for the search warrant (2:15-mj-60, ECF No. 1-1), the Drug Enforcement Administration's Report of Investigation (ECF No. 320-2), and the testimony and exhibits admitted into evidence at the hearing.[1] In this recitation of facts and in reaching the legal conclusions described below, the Court credits the testimony of Agent Brandon Hope ("Agent Hope") and Task Force Officer David Madore ("TFO Madore"), the two officers who testified at the June 14th hearing.

---

[1] As clearly stated on the record, the testimony of Noel was struck from the record and plays no role in the Court's factual findings.

On March 19, 2015, arrest warrants were issued in the District of Vermont for Gary Delima ("Delima") and Sharif Cargo ("Cargo"). Based on law enforcement surveillance, including communications intercepts pursuant to wiretap warrants,[2] law enforcement learned that Delima and Cargo were traveling from New York to Maine. Law enforcement surveillance had previously determined that Delima had stayed at Apartment # 2, 96 Second Street, Auburn, Maine (the "Second Street Apartment") from March 1-10, 2015. In intercepted cellular phone text messages, Delima had referred to this apartment as his "crib." (Gov't Ex. 1, Page 73 of 131, Session 2734; Gov't Ex. 1, Page 86 of 95, Session 3242.) In cellular communications, Delima provided directions to others on how to visit the Second Street Apartment and corresponded with O'Toole regarding where certain items were stored or hidden in the apartment. Law enforcement had also determined that Delima had transferred money to O'Toole, the lessee of the Second Street Apartment, and intercepted communications between Delima and Cargo concerning O'Toole's cash rent payments to the landlord.

Agent Hope participated in physical surveillance in the Auburn, Maine area in the evening hours of March 23, 2015. Agent Hope observed a gold-colored Jeep Grand Cherokee vehicle that law enforcement had previously observed Delima using on a number of occasions. The Jeep exited into the Auburn area and parked in the vicinity of the Second Street Apartment. Between approximately 11:00 PM and 12:00 AM, law enforcement officers observed multiple individuals exit the Jeep and enter the apartment building at 96 Second Street, but they were not able to identify the individuals or to see which apartment they entered.

Approximately fifteen law enforcement officials, including Agent Hope and TFO Madore, participated in a meeting at approximately 5:00 AM on March 24, 2015, to discuss the next steps

---

[2] This Court rules today in a separate Order that the warrants authorizing these wiretaps were lawfully issued. (ECF No. 347.)

in their investigation. Specifically, they discussed executing the arrest warrants for Delima and Cargo at the Second Street Apartment shortly after 6:00 AM that morning. Law enforcement discussed whether to knock and announce their presence at the Second Street Apartment when executing the warrants. As of that time, law enforcement had intercepted communications between Delima and others in which law enforcement officials concluded, in the context of their investigation, that Delima was discussing the purchase and ownership of three different firearms, one of which, the text messages suggested, was present in Maine. Certain of the text messages were understood by law enforcement to concern a transaction to purchase a firearm in Maine. In a traffic stop conducted by law enforcement of the suspected seller of the gun, law enforcement determined that the suspected seller was in possession of $1,800 in cash, the amount that law enforcement had determined was the purchase price for the gun in a transaction the previous day. Further, law enforcement had intercepted communications that, in the context of the investigation, appeared to discuss two separate homicides in the New York area and alluded to the involvement of Delima or his associates in one of the homicides, including the statement "we did that to him." (Gov't Ex. 1, Page 90 of 148, Session 222.) Agent Hope and TFO Madore both testified that a decision was made to execute the arrest warrants using an "element of surprise" and at a time when law enforcement officials expected that the occupants of the Second Street Apartment would be asleep.

At a time between 6:00 AM and 6:30 AM on March 24, 2015, law enforcement officers executed the two arrest warrants at the Second Street Apartment. The officers did not knock prior to entering the residence, but rather pried the door open and announced their presence while crossing the threshold of the door and entering the apartment. Upon entry, law enforcement discovered Delima, Cargo, O'Toole, Noel, Malik Delima, and Shaun Wray in the apartment. Gary

3

Delima and Sharif Cargo were arrested, and the other occupants were detained in the apartment. Law enforcement personnel observed certain items in plain view, specifically credit cards. Agent Hope and TFO Madore testified that no search of the Second Street Apartment was conducted at this time, except for searches of the arrested and detained persons and certain areas in close proximity to detained persons, and a sweep of the Second Street Apartment to ensure no undiscovered individuals remained within the apartment.

TFO Madore prepared an application for a search warrant of the Second Street Apartment and a supporting affidavit on March 23, 2015, and he scheduled a meeting with Magistrate Judge Rich in Portland, Maine, for about 8:00 AM on March 24, 2015. Consequently, after participating in the initial entry of the Second Street Apartment, TFO Madore drove to Portland to meet with the Magistrate Judge. The search warrant was authorized by Magistrate Judge Rich at about 8:30 AM on March 24, 2015. TFO Madore called the law enforcement officers at the Second Street Apartment to inform them that the search warrant had issued. Law enforcement officials then conducted a search of the Second Street Apartment and seized certain items. Amongst the items seized were credit cards, devices used in the fabrication or modification of credit cards, a computer, and firearm ammunition. No firearm was discovered in the search.

## II.   CONCLUSIONS AND DISCUSSION

### a.   There Was No Knock and Announce Violation.

Defendant argues that the law enforcement officers violated the knock and announce rule when they entered the Second Street Apartment without first knocking and announcing their presence. Ordinarily, police executing a warrant must knock and announce their presence before entering a dwelling subject to Fourth Amendment protections, such as a private residence. United States v. Hawkins, 139 F.3d 29, 32 (1st Cir. 1998). However, a "no-knock" entry is reasonable if

the police "have a reasonable suspicion that knocking and announcing their presence, under the particular circumstances, would be dangerous or futile, or that it would inhibit the effective investigation of the crime by, for example, allowing the destruction of evidence." United States v. Boulanger, 444 F.3d 76, 81 (1st Cir. 2006) (quoting Richards v. Wisconsin, 520 U.S. 385, 394 (1997)).  Reasonable suspicion can be supported by such considerations as whether investigative sources suggest that the suspect is in possession of a weapon, whether the suspect has a criminal history involving the use of firearms, and whether the suspect is believed to have been involved in recent violent offenses.  Id. at 82.

In this case, law enforcement had a reasonable suspicion that Delima was armed and posed a danger to the safety of the law enforcement officers, and so it was not a violation of the knock and announce rule for them to enter the Second Street Apartment without first knocking and announcing their presence.  Consistent with the kinds of considerations that First Circuit has identified as supporting reasonable suspicion, law enforcement had uncovered evidence that Delima and certain of his associates owned or possessed firearms, that a firearm may have been acquired in Maine and remained in Maine, and that Delima may have been involved in recent violent criminal acts.  Each of these considerations provided support for law enforcement's reasonable suspicion that announcing their presence at the Second Street Apartment could have been dangerous under the circumstances.

Further, the arrest warrants had been issued in connection with a drug-trafficking investigation.  As the First Circuit recently concluded, an affidavit containing details of a drug-trafficking investigation, but with no specific information concerning the suspected presence of a firearm, gave rise to a "commonsense inference" that the suspected drug dealer "would have a firearm at his home to protect his drug cash and spoils."  United States v. Rivera, 2016 WL

5

3202587, *4 (1st Cir. 2016) (citing United States v. Rivera-Gonzalez, 776 F.3d 45, 51 (1st Cir. 2015), for the proposition that guns are common in the drug trade).  In this case, while the nature of the drug investigation may itself have given rise to a concern about dangerousness, law enforcement's reasonable suspicion was bolstered by specific information about firearms and violent crimes obtained in the investigation.

Even if law enforcement had violated the knock and announce rule in its execution of the arrest warrants for Delima and Cargo, Defendants are incorrect in their argument that the exclusionary rule applies to any evidence seized pursuant to the execution of those warrants.  The parties agree that under Hudson v. Michigan, 547 U.S. 586 (2006), the exclusionary rule does not apply if the police violate the knock and announce rule while executing a search warrant. However, according to Defendants, the rule does not apply when the warrant being executed is an arrest warrant.  To support their argument that the holding in Hudson does not extend to arrest warrants, Defendants cite United States v. Weaver, 808 F.3d 26 (D.C. Cir. 2015), in which a divided panel of the D.C. Circuit Court concluded that "the exclusionary rule is the appropriate remedy for knock-and-announce violations in the execution of arrest warrants at a person's home." Id. at 45.  However, the First Circuit previously considered the precise issue decided in Weaver and reached the opposite conclusion: that under Hudson, the exclusionary rule does not apply to evidence obtained following a knock and announce violation in the execution of a valid arrest warrant.  See United States v. Pelletier, 469 F.3d 194 (1st Cir. 2006); United States v. Jones, 523 F.3d 31, 36 (1st Cir. 2008) ("[W]e have recognized the absence of an exclusionary rule for knock-and-announce violations, provided the police have a valid arrest warrant or some other valid grant of authority to enter the target's residence, and reason to believe the target is inside").

While Defendants argue that Jones and Pelletier may be distinguishable from the facts of this case, the Court concludes that the First Circuit has been clear and unambiguous in its conclusion that suppression of evidence is not the remedy for a violation of the knock and announce rule in the execution of an arrest warrant. Because Defendants have not argued that the arrest warrants were invalid, the evidence recovered subsequent to the execution of the arrest warrants is admissible, and even a conclusion that law enforcement violated the knock and announce rule would not result in the suppression of the seized evidence.

### b. The Arrest Warrants at Issue Were Lawfully Executed at the Second Street Apartment.

As an alternative argument for exclusion of the seized evidence, Defendants argue that law enforcement lacked a reasonable belief that either Gary Delima or Sharif Cargo resided at the Second Street Apartment and would be physically present there when the arrest warrants were executed. As a general matter, law enforcement officials with an arrest warrant must first obtain a search warrant before executing that arrest warrant in the residence of a third person that is not also the residence of the subject of the arrest warrant. Steagald v. United States, 451 U.S. 204, 216 (1981). According to Defendants, if the arrest warrants were unlawfully executed in the home of a third person, in this case the home of O'Toole, that was not also the residence of Delima or Cargo, then any evidence seized in the Second Street Apartment subsequent to those arrests should be suppressed.

Law enforcement may execute an arrest warrant for a person in a residence without also obtaining a search warrant if law enforcement reasonably believed prior to entry that the person (1) resided at the residence and (2) would be present at the residence when the arrest warrant was executed. United States v. Graham, 553 F.3d 6, 12 (1st Cir. 2009) (citing United States v. Weems, 322 F.3d 18, 22 (1st Cir. 2003)). The First Circuit has noted that it has implicitly regarded the

7

"reasonable belief" standard as being lower than the probable cause standard. United States v. Werra, 638 F.3d 326, 337 (1st Cir. 2011). See also United States v. Hamilton, 819 F.3d 503, 506 n.5 (1st Cir. 2016) ("We assume without deciding that reasonable belief is a lesser standard than probable cause").[3]

At the evidentiary hearing, counsel for Noel agreed that law enforcement had reason to believe that Delima was physically present inside the Second Street Apartment on the morning of March 24, 2015. Given that this point does not appear to be in dispute, the Court simply notes that the evidence amply supports Delima's presence at the Second Street Apartment. As described by both Agent Hope and TFO Madore, intercepted communications indicated that Gary Delima would be arriving at the Second Street Apartment the evening of March 23, 2015. Surveillance provided corroborating (if not conclusive) evidence of his arrival when law enforcement first observed the vehicle associated with Delima arriving at the apartment complex at 96 Second Street, and then observed multiple individuals exiting the car and entering the building. Delima's presence was also supported by the wiretap on his cellular phone, which indicated through the phone's "pings" that the phone was brought to the Auburn area late in the night on March 23. The intercepted communications, physical observation of the gold Jeep's arrival at the apartment complex and disembarkation of the passengers, and the cellular phone pings collectively satisfy and surpass the legal standard that law enforcement have a "reasonable belief" that Delima would be present in the Second Street Apartment when the warrant was executed.

Defendants focus their arguments on the first prong of the test, and dispute that law enforcement reasonably believed that Delima resided at the Second Street Apartment. In Hamilton, a defendant's residency and likelihood of presence at a particular address were

---

[3] For the purposes of this analysis, the distinction is not important. Even applying the probable cause standard, the Court would likewise conclude that the Government has satisfied the two prongs of residency and presence.

supported by postal records and certain database information that associated the defendant with the address, even though surveillance failed to provide corroborating evidence that the defendant resided there. 819 F.3d at 507-08. See also United States v. Graham, 553 F.3d 6, 13-14 (1st Cir. 2009) (finding that a police report identifying the defendant as living at a residence, a third party's description of defendant as "staying at" that residence, and a neighbor associating the defendant's picture with the address supported "reasonable belief"). In this case, government surveillance revealed that Delima stayed at the Second Street Apartment on a continuous basis from March 1-10, 2015, repeatedly referred to the apartment as his "crib," gave directions to another individual as to how to come to the Second Street Apartment, and communicated with O'Toole about where certain items had been stored or hidden in the Second Street Apartment. In addition, law enforcement obtained information regarding money transfers from Delima to O'Toole, which law enforcement officials believed, in the context of the investigation, was money to be used for paying rent for the Second Street Apartment. All of these factors support a reasonable belief by law enforcement that Delima resided at the Second Street Apartment at the time the arrest warrants were executed.

Defendants have argued that merely verifying Delima's presence for a ten-day period in early March, with a return visit to the Second Street Apartment later that same month, does not show a pattern of residency, but rather limited and discrete visits as an overnight guest. However, the precise number of days that Delima stayed at the Second Street Apartment is not dispositive one way or the other. See Jones, 523 F.3d at 37 (finding entry into a hotel room lawful where the hotel manager told law enforcement that the suspect had rented a room for a three-week period); United States v. Risse, 83 F.3d 212, 214-15 (8th Cir. 1996) (finding entry lawful where the defendant had told police that she was "staying" at a particular location and could be contacted

there); Pelletier, 469 F.3d at 199 (explaining that the limited grant of authority to enter a target person's residence extends to temporary residences). In fact, as discussed in Hamilton, law enforcement need not have conclusively determined that a suspect spent particular periods of time at a residence to form a reasonable belief of residence there, if other factors could support that belief.

Defendants also argue that Delima did not reside at the Second Street Apartment because he had a residence in New York, and was known by law enforcement to stay for periods of time in Vermont as well. However, this argument is also unavailing. The fact that Delima split time between several residential properties in different states does not mean that law enforcement could not reasonably believe he also resided at the Second Street Apartment. After all, law enforcement knew that he recently stayed at the Second Street Apartment for an extended period of ten days, that he immediately returned to the apartment upon coming back to Maine, that he had arranged for individuals to meet him at the apartment, and that he stored and hid items at the apartment. Additionally, law enforcement reasonably believed that Delima was contributing to payments of the rent for the Second Street Apartment. Taken together, these considerations support a reasonable belief that Delima was not a mere guest at the Second Street Apartment, but rather was a resident.

### c. The Evidence Seized Pursuant to the Search Warrant for the Second Street Apartment is Admissible Under the Inevitable Discovery Exception.

Even if law enforcement lacked a reasonable belief that Delima resided in the Second Street Apartment, rendering any search and seizure of evidence pursuant to the arrest of Delima and Cargo unlawful, the evidence seized from the Second Street Apartment would nonetheless be admissible under the inevitable discovery exception. Evidence that would otherwise be excluded because of a Fourth Amendment violation (as Defendants have alleged occurred here) remains

admissible "[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means." Nix v. Williams, 467 U.S. 431, 444 (1984). The First Circuit has sought to guide this determination with three considerations: "are the legal means truly independent; are both the use of the legal means and the discovery by that means truly inevitable; and does the application of the inevitable discovery exception either provide an incentive for police misconduct or significantly weaken fourth amendment protection?" United States v. Silvestri, 787 F.2d 736, 744 (1st Cir. 1986). While the Court's analysis is to be "flexible enough to handle many different fact patterns," id. at 746, the Supreme Court instructs courts to "focus[] on demonstrated historical facts capable of ready verification." Nix, 467 U.S. at 444 n.5.

Applying this approach, the Government meets the preponderance standard that any evidence seized or otherwise discovered at the Second Street Apartment while the arrest warrants were being executed and the other apartment occupants detained, would have inevitably been discovered by lawful means. Defendants do not contest that the search warrant application and affidavit were prepared prior to the arrest of Delima and Cargo. Nor have they challenged TFO Madore's testimony that he sought an appointment with a judicial officer to apply for the warrant on March 23, 2015, and that the early-morning appointment with Magistrate Judge Rich was scheduled as a result. Finally, neither the application nor the affidavit contained any information pertaining to or obtained from the execution of the arrest warrants for Delima and Cargo, a point on which there is no disagreement.

Thus, using a process and information that was truly independent of the arrest of Delima and Cargo, a search warrant for the Second Street Apartment was issued on March 24, 2015. The search of the Second Street Apartment conducted under this warrant was a comprehensive search

going far beyond the limited safety-related searches Agent Hope and TFO Madore described as occurring when Delima and Cargo were arrested and the other occupants detained. Thus, no evidence discovered in the Second Street Apartment was found only because of search activities conducted during the arrests, but rather it was inevitable that the evidence seized from the Second Street Apartment would be discovered once the search warrant was obtained.[4] Finally, in this case, where a search warrant was pursued even prior to the execution of the arrest warrants, was obtained shortly thereafter, and where law enforcement did nothing beyond securing the Second Street Apartment and performing safety-related searches prior to the issuance of the warrant, there is no special concern about incentivizing police misconduct that would render the inevitable discovery exception inapplicable. See United States v. Almeida, 748 F.3d 41, 49-50 (1st Cir. 2014) (finding that "the exception will not incentivize unconstitutional behavior" where the earlier unlawful action "gave the police no particular investigative advantage").

In summary, the Court concludes that law enforcement officials did not conduct an unlawful arrest in the residence of a third person when arresting Delima and Cargo, because they reasonably believed that Delima resided at the Second Street Apartment and would be physically present there the morning of March 24, 2015. However, even if law enforcement lacked a reasonable belief as to either of those issues, the Court finds the evidence seized from the Second Street Apartment would still be admissible under the inevitable discovery exception.

---

[4] According to the testimony of Agent Hope and TFO Madore, which the Court credits, no property in the Second Street Apartment was seized prior to TFO Madore notifying his colleagues that a search warrant for the Second Street Apartment had been issued, but rather law enforcement secured the residence at the time that Delima and Cargo were arrested, in anticipation of a search warrant subsequently being obtained. These facts support the Government's argument in favor of inevitable discovery, and militates against a concern of incentivizing police misconduct.

### III.  CONCLUSION

For the above-stated reasons, the Motion to Suppress (ECF No. 320) is DENIED.

                                               SO ORDERED.

                                               /s/ George Z. Singal
                                               United States District Judge

Dated this 20th day of June, 2016.